2024 IL App (1st) 231701-U

SECOND DIVISION
March 26, 2024

No. 1-23-1701

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | |
| B.S. | ) | Appeal from the |
|     Minor-Respondent-Appellee | ) | Circuit Court of |
| | ) | Cook County |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | 17 JA 1294 |
|     v. | ) | |
| | ) | |
| SAVANNAH M., | ) | Honorable |
|     Mother-Respondent-Appellant. | ) | Sybil Thomas, |
| | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Though trial court erred in denying respondent short continuance to procure DCFS case file, respondent was not prejudiced by denial.

¶ 2    The State filed a petition to involuntarily terminate the parental rights of S.M., the respondent and biological mother to B.S. B.S. was born with cocaine and opiates in her system, and her mother had repeatedly refused to avail herself of any services or meaningfully try to reunite with her child during the more than five years B.S. was in foster care.

¶ 3    About a week before the termination hearing, respondent's counsel sought a continuance.

He had not been given the Department of Children and Family Services (DCFS) agency case file, even though the court had ordered it turned over to respondent five months earlier. Counsel answered not ready to proceed with the hearing, but the court denied his request. Shortly after, the court found that respondent was unfit and that it was in B.S.'s best interests that her biological mother's rights be terminated.

¶ 4    Respondent appeals, claiming the court should have given her more time to procure the DCFS file and review it before the hearing.  We agree that the court should have granted respondent a short reprieve to procure and review the file before the hearing. However, because of the overwhelming evidence of unfitness—evidence that respondent essentially disappeared and made no effort to reunite with her daughter for years—this error did not affect the outcome here. We affirm.

¶ 5                                    BACKGROUND

¶ 6     On August 29, 2017, respondent gave birth to B.S. At birth, B.S. had cocaine and opiates in her system. A case was opened on September 15, 2017, but S.M. refused to participate in services, admitted to using illegal drugs while pregnant, and violated the safety plan put in place. At one point, S.M. and B.S.'s whereabouts were unknown.

¶ 7    In December 2017, the State filed a petition for adjudication of wardship and a motion for temporary custody, and the court issued a child protection warrant for B.S. On February 1, 2018, authorities executed the warrant and took custody of B.S. Meanwhile, respondent was referred for a substance abuse assessment. But—as would become a common theme—she refused to participate. At one point, the court believed respondent was intoxicated during a court hearing and ordered her to complete a urinalysis; she again refused. The court also ordered the parties to enter mediation with the goal of reunifying B.S. with her mother. But respondent did not

participate in the mediation, which was held in March 2018.

¶ 8    On August 21, 2018, the trial court found B.S. was neglected due to being in an injurious environment and being born drug-exposed. Approximately six weeks later, at a dispositional hearing, the court made B.S. a ward of the court and placed her under the guardianship of DCFS. The court set a permanency goal of returning home but noted that neither S.M. nor B.S.'s father (who is not a party to this appeal) were present at the hearing, nor had either biological parent made substantial progress toward returning B.S. home.

¶ 9    Respondent seemed uninterested in the proceedings, prompting her court-appointed attorney to move to withdraw in June 2019. In his motion, counsel noted that his client had not appeared at 11 court dates and did not communicate or cooperate with him. However, when respondent showed up at the next court date, in July 2019, counsel withdrew his motion to withdraw and continued representing her.

¶ 10    That same day, the court reviewed the progress (or lack thereof) in the case. The court found that respondent had not made substantial progress toward the return of B.S., was not engaged in services or visiting with her daughter, and did not comply with court-ordered drug tests. Still, the court entered a permanency goal of returning B.S. home in 12 months.

¶ 11    Six months later, in January 2020, respondent was still not participating in services or visiting B.S., and the court again found that she was not making substantial progress toward reuniting with her daughter. Fast forward to March 2021, and respondent did not show up to the status hearing, and the court concluded she still was not making substantial progress toward a return home.

¶ 12    In August 2022, the court changed B.S.'s permanency goal to substitute care pending a court determination on respondent's parental rights. B.S.'s father had recently passed away (the

details are not in the record), and the court found that B.S. had been in the same foster home for most of her life and was bonded with that foster family. Again, respondent was not present at the hearing.

¶ 13    On March 21, 2023, the State filed a petition seeking to terminate respondent's parental rights. The petition alleged that respondent was unfit for four reasons: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to B.S.'s welfare; (2) she deserted the child for more than three months before the termination proceedings began; (3) she failed to make reasonable efforts to correct the conditions which were the basis of B.S.'s removal and failed to make reasonable progress toward the return of B.S.; and (4) she evidenced intent to forgo her parental rights, for a period of 12 months, by failing to visit B.S., communicate with the child or DCFS, maintain contact with B.S., and plan for B.S.'s future. The petition also pointed out that B.S. had been with her pre-adoptive foster parents since January 2018.

¶ 14    The following day, March 22, the parties appeared in court. Respondent was again not there but was represented by counsel. The court entered an order requiring DCFS to tender a copy of B.S.'s agency file to DCFS's regional counsel within 28 days so the file could then be tendered to the State, which would pass it along to respondent's counsel.

¶ 15    Everyone came back to court on June 24. On that date, the State told the court that it had not yet received the DCFS file. The court reiterated that the file needed to be turned over (in a file format that the State could access, which seemed to be part of the problem) and tendered to defense counsel quickly, since the hearing was scheduled for August.

¶ 16    In July 2023, the parties met for a pre-hearing conference, and the court entered a case management conference order. The management order specified a witness list and exhibits likely to be presented at the termination hearing. The order also included a line requiring the State to

tender all exhibits in their possession 14 days prior to trial, with the Public Guardian and respondent's attorney to review and tender any additional evidence within seven days of the trial. The "agency file" was included in the exhibit list, but the parties made no mention of whether it had been turned over yet. Additionally, the order required that any request for relief from the order be made in writing and presented to the judge no less than seven days before the scheduled trial. The termination hearing was set for August 24, 2023.

¶ 17    On August 18, 2023, respondent's attorney filed two motions: one requesting a continuance, and the other renewing his request for the DCFS agency file. In the motion requesting a continuance, respondent said that the agency file had not yet been tendered to counsel and that it may contain evidence relevant to the proceedings. Counsel asked the court to enter an order to have the agency file turned over, and for "some time to review the file and prepare an effective defense for" respondent. The court did not rule on the motion before the August 24 hearing.

¶ 18    When everyone was back in court on August 24, respondent's counsel answered "not ready" to proceed with the termination hearing. Counsel renewed his request for a short continuance and the agency file, telling the court that he believed it was important to the case and to preserve a record for appeal. Counsel apologized for not bringing it up earlier and admitted that he signed the case management order not realizing he did not have the file.

¶ 19    The court denied counsel's motion but expressed frustration that the file had not been turned over. In its ruling, the court believed that the file might be relevant to some of the grounds for unfitness the State alleged, but that it was irrelevant to others and was unnecessary. The parties discovered that Sierra Rhymes, the DCFS caseworker assigned to B.S.'s case, had given the file to DCFS's regional counsel (who was present at the hearing), but that the file had been

put to the wrong computer folder. In short, it appeared there was a breakdown in the process by which the caseworker would upload the file, and then the file would be redacted by legal counsel before being tendered. Counsel for DCFS apologized to the court and admitted that there were failures in the process that resulted in the file never being sent to either the State or respondent's counsel.

¶ 20    The court admitted that the "system is flawed, without question, and if it were a different situation, I would grant a continuance to [respondent] and move on [but] this would be delayed further." Despite acknowledging the breakdowns, the court denied respondent's motion, and the hearing went forward. Respondent was not present at the termination hearing.

¶ 21    The State began its case by presenting several exhibits. They generally established that respondent had never participated in any significant way with the services, assessments, or programs she was offered.

¶ 22    At B.S.'s birth, respondent and her daughter tested positive for cocaine and opiates, and respondent admitted she had been using illegal drugs. Although offered services to help with her substance abuse struggles, respondent failed to comply with any recommendations. At one point, respondent violated a safety plan by having unsupervised contact with B.S. and failing to check in with caseworkers. The court made B.S. a ward of DCFS in December of 2017, and at that time, the whereabouts of the child were unknown. After the court issued a child-protection warrant, Cook County Sheriff's deputies found B.S. and brought her to a shelter at the end of January 2018.

¶ 23    After DCFS took custody of B.S., respondent was asked to attend a substance abuse evaluation but again failed to show up. In March 2018, the court ordered her to submit a drug test, but again, respondent refused to do so. Later that month, at a scheduled visit with her

daughter, respondent appeared severely intoxicated or under the influence—so much that she did not realize she was sitting next to her daughter in the agency waiting room. After that, the agency suspended future visitations between respondent and B.S.

¶ 24    From there on, the record is replete with evidence that respondent did not attempt to use any of the resources that were offered to her, nor did she comply with orders to submit for drug screening. Frequently during the pendency of the case, respondent disappeared and could not be found. She also did not visit with or have contact with her daughter. Eventually, in late 2022, DCFS found respondent, and she expressed a desire to reunite with her daughter. However, she continued to refuse to participate in any services.

¶ 25    Rhymes also testified at the hearing. Generally, she repeated the theme of the case—that respondent was frequently offered help, refused to take it, and would not comply with any requests the court or agency asked of her. Rhymes said that even after she told respondent she was at risk of having her parental rights terminated, respondent did not change course. By the time of the hearing, B.S. had been living with her foster family for more than five years and had no relationship with respondent.

¶ 26    The court ruled that the State had established, by clear and convincing evidence, that respondent was unfit on all grounds alleged. At the best-interests hearing, which happened immediately thereafter, the court heard evidence that B.S. was flourishing with her foster family. She participated in soccer, baseball, dance, and gymnastics, and was enrolled in school. B.S.'s foster mother testified they intended to adopt B.S. because she was like one of her own children. The court concluded that it was in B.S.'s best interests that respondent's parental rights be involuntarily terminated and appointed DCFS to be B.S.'s guardian with the right to consent to her adoption. Respondent never appeared at the hearing.

¶ 27    Respondent now appeals.

¶ 28                                    ANALYSIS

¶ 29    On appeal, respondent challenges only the trial court's refusal to grant her a continuance to procure the DCFS case file. She claims the court acted unreasonably when it recognized that the process by which she should have received the discovery was "flawed" but still refused to grant her time to get it.

¶ 30    In Illinois, the authority to involuntarily terminate a parent's rights is purely statutory, and the scope of the court's authority is laid out in the Juvenile Court Act and Adoption Act. *In re E.B.*, 231 Ill. 2d 459, 463 (2008); 705 ILCS 405/1-1 *et seq.* (West 2022); 750 ILCS 50/0.01 *et seq.* (West 2022). The authority is considerable, as it determines whether a person should continue to hold the legal status of parent or have their rights removed forever. *In re D.D.* 196 Ill 2d 405, 417 (2001). Terminating a parent's rights touches upon a fundamental liberty interest and can result in dire consequences if the State succeeds in proving its case. *In re M.H.*, 313 Ill. App. 3d 205, 214 (2000).

¶ 31    When the State has filed a petition to terminate a natural parent's rights to their child, the court must first determine if the challenged parent is unfit, as defined by statute. 705 ILCS 405/2-29 (West 2022). If the court so finds, it then considers if it is in the best interest of the child that the parent's rights be terminated. *Id*. If the court affirmatively finds both, the parent's rights are terminated, and the child can be placed for adoption. *Id.*

¶ 32    Basic discovery principles that control civil cases apply to proceedings brought under the Juvenile Court Act. 705 ILCS 405/2-18(a) (West 2022) ("rules of evidence in the nature of civil proceeding in this State are applicable to proceedings under this Article."); *In re H.C.*, 2023 IL App (1st) 220881, ¶ 124. Supreme Court Rule 201 governs discovery in civil cases and applies

to juvenile abuse and neglect proceedings. Ill. S. Ct. R. 201 (eff. Mar. 17, 2023); *In re R.V.*, 288 Ill. App. 3d 860, 869 (1997). A party "may obtain by discovery full disclosure of any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party, including the existence, description, nature, custody, condition, and location of any documents or tangible things[.]." Ill. S. Ct. R. 201(b)(1) (eff. Mar. 17, 2023).

¶ 33 Whether to grant a continuance is within the sound discretion of the trial court, and we will not overturn that decision absent an abuse of that discretion. *In re D.M.*, 2020 IL App (1st) 200103, ¶ 20. A court abuses its discretion in denying a continuance when it acts arbitrarily or unreasonably. *K & K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 22. A court can abuse its discretion when it denies a continuance to allow a party a reasonable opportunity to procure evidence that is essential to their case. See *Vollentine v. Christoff*, 24 Ill. App. 3d 92, 96 (1974). A court should not deny a motion for continuance if doing so would defeat the ends of justice. *Chicago City Bank and Trust Co. v. Pick*, 235 Ill. App. 3d 252, 255 (1992).

¶ 34 It is uncontested that respondent should have been tendered the DCFS agency file before trial. In child-protection proceedings, the parties and their attorneys have a right to review the agency file. 20 ILCS 505/35.1 (West 2022). To advance that process, the court here entered an order on March 23, 2023, directing DCFS to tender B.S.'s agency file to the DCFS regional counsel, with the understanding that counsel would pass that file along to the State, which in turn would tender it to respondent's counsel. The court wanted the file to be turned over within 28 days of the entry of the order.

¶ 35 That did not happen. At a status hearing on June 14, 2023, the assistant state's attorney

noted that she had not yet received the agency file. DCFS counsel was present and told the court the agency should have it ready by the end of the following week. The parties ended the hearing with the understanding it would be tendered before the next date in July. But at that hearing, there was no mention of the file. Then, six days before the hearing, respondent's counsel informed the court he had not yet received the file and would be asking for a continuance.

¶ 36    Although respondent's counsel accepted responsibility for failing to inform the court and parties earlier, it was DCFS that was ordered to tender the file, and the State which had accepted responsibility to gather it and give it to defense counsel. In the absence of any evidence that any party blatantly or willfully violated the discovery order, one preferred remedy to noncompliance with a discovery order is a short continuance—exactly what counsel sought. See Ill. S. Ct. R. 219(c)(i) (eff. July 1, 2002) (If party fails to comply with discover order, appropriate remedy is that "further proceedings be stayed until the order … is complied with.")

¶ 37    *In re H.C.*, 2023 IL App (1st) 220881, is useful to the discussion at hand. There, the State sought to establish that a mother had abused or neglected her children. *Id.* ¶ 1. The case proceeded to an adjudicatory hearing, and at the cusp of closing its case, the State handed over 18,603 pages of medical records to defense counsel—none of which were tendered before the hearing began. *Id.* Defense counsel accepted the bulk file but did not move for a continuance to review it, despite having never seen it before the hearing began. *Id.* ¶ 2. Inside that surprise discovery was a highly prejudicial report from a doctor. *Id.* ¶ 129.

¶ 38    On appeal, the mother argued that her trial counsel had been ineffective for, among other reasons, failing to move for a continuance after receiving the voluminous discovery mid-trial. *Id.*, ¶ 85. Chastising the "tardy action on the part of the State," this court agreed that counsel should have requested a continuance to review the pile of papers that were dropped on them in

the middle of a hearing on a drastically consequential question—whether a mother had abused and neglected her child. *Id.* ¶¶ 131-134.

¶ 39     In some ways, counsel here was put in an even more difficult position than his counterpart in *H.C.* Despite a court order to produce the DCFS agency file, he *never* received it. Not before the hearing, not the day of, not even during it. Whereas the mother in *H.C.* was ambushed mid-hearing by the discovery, she at least eventually got it. *Id.* ¶ 85. Respondent's attorney here had to go in completely blindfolded. Had counsel *not* asked for a continuance, respondent could easily have argued he was as ineffective as the attorney in *H.C.*.

¶ 40     Even the court here acknowledged that the agency file was "critical," and that the caseworker needed "to make sure that is has been received and make sure it can be opened" and tendered to the parties. Such critical evidence cannot be left out when the liberty interests of a mother to her child are at stake, no matter the circumstances of the case.

¶ 41     The Public Guardian lays much of the blame at respondent counsel's feet for not realizing sooner that he was not given the case file. But this could not be chalked up to his failings alone. The court had already ordered DCFS to turn over the file, and the State accepted the responsibility to tender it. While we do not accuse anyone of gamesmanship, we share the trial court's sentiment that this case highlights a "flawed" system and not the failure of one attorney. The termination of one's parental rights is one of the most drastic and permanent actions a court can take. *M.H.*, 313 Ill. App. 3d at 211. The consequences of the system's flaws should not fall solely on a mother who is fighting to preserve her rights.

¶ 42     The Public Guardian also argues that any delay would have been unreasonable because these cases can cause great harm to children and courts need to act in a just and speedy manner. *In re D.M.*, 2020 IL App (1st) 200103, ¶ 36. It is true that our primary concern is the best interest

of the child. *In re Arthur H.*, 202 Ill. 2d 441, 464 (2004). But the proceedings here had stretched out over nearly six years, and this was the first time that the termination hearing had been set. In the context of this case, a short delay to procure the DCFS file would have been negligible at best. A court's need to act expeditiously cannot come at the cost of leaving a challenged parent unprepared to defend themselves when the State wants to extinguish their rights. See *H.C.*, 2023 IL App (1st) 220881, ¶ 131.

¶ 43    We also recognize that respondent moved for a continuance six days before the hearing, despite the case management order requiring seven days' notice. However, just as we do not see gamesmanship by DCFS or the State to try and hamstring respondent by not turning over the file, we see no indication respondent or counsel were trying to unnecessarily delay the proceedings. Counsel admitted his oversight and was apologetic to the court for it, then asked for a reasonable accommodation to get the file.

¶ 44    We conclude the trial court acted unreasonably when it recognized the importance of the DCFS file yet refused to continue the matter for defense counsel to obtain it. The court should have granted a short continuance, and it was error to proceed to the hearing without the file.

¶ 45    But that error does not automatically require reversal. We will not reverse unless S.M. suffered prejudice. *In re K.N.*, 2024 IL App (4th) 230301-U, ¶ 42; *In re K.O.*, 336 Ill. App. 3d 98, 104 (2002); *In re M.R.,* 305 Ill.App.3d 1083, 1086 (1999). Given the overwhelming evidence of respondent's unfitness, it is clear that no error in denying the continuance could have possibly affected the outcome of this proceeding.

¶ 46    The State alleged respondent was unfit for multiple reasons, including that (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; (2) she failed to make reasonable efforts to correct the conditions which were the basis of the

child's removal or make reasonable efforts toward the return of the child within any 9-month period after the child was adjudicated neglected or abused; and (3) respondent evidenced intent to forgo her parental rights by, among other reasons, failing to visit, communicate with or maintain contact with or plan for the future of the child. 750 ILCS 50/1(b), (m), (n) (West 2022).

¶ 47    The evidence consistently and overwhelmingly showed that respondent made little to no effort to try to reunify with her daughter and seemed to lose interest entirely in the proceedings. Failing to make reasonable efforts or show reasonable progress toward reunification is grounds to find a parent unfit. *Id.* § 1(D)(m). Respondent never made herself available for evaluation for reunification services, was frequently rated unsatisfactory in the client service plans set up for her, and never showed Rhymes, the caseworker, any evidence she was participating in other services the court and agency required her to. See *In re. D.M.*, 2020 IL App (1st) 200103, ¶ 35.

¶ 48    S.M. missed nearly every court date—including the adjudication terminating her parental rights. True, while a parent has a right to be present at all court dates, her attendance is not mandatory. *K.O.*, 336 Ill. App. 3d at 105. Still, S.M.'s repeated absence highlighted a persistent disinterest in reuniting with her daughter, as did the fact that she went long periods without contacting or visiting B.S. The record reveals that respondent last visited her daughter in 2018 when she was seven months old. By the time of the hearing, B.S. was about to turn 6.

¶ 49    We are thus confident that the failure to grant a continuance did not affect the outcome of this proceedings. Respondent suffered no prejudice from the error.

¶ 50                                  CONCLUSION

¶ 51    The judgment of the circuit court is affirmed.

¶ 52    Affirmed.